IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2020

## STATE OF TENNESSEE v. CHRISTOPHER AARON HODGES

**Appeal from the Criminal Court for Sullivan County
No. S63-915  James F. Goodwin, Jr., Judge**

_____

### No. E2019-01049-CCA-R3-CD

_____

A Sullivan County Criminal Court Jury convicted the Appellant, Christopher Aaron Hodges, of sexual battery by an authority figure, and the trial court sentenced the Appellant to five years in the Tennessee Department of Correction.  On appeal, the Appellant challenges the denial of his motion for a judgment of acquittal at the close of the State's proof pursuant to Tennessee Rule of Criminal Procedure 29, the trial court's ruling as a thirteenth juror pursuant to Tennessee Rule of Criminal Procedure 33(d), the trial court's refusal to grant a continuance, the trial court's failure to allow defense counsel to make closing argument before instructing the jury, and the trial court's failure to grant a motion for new trial.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Darcee Leann Kubisiak, Johnson City, Tennessee, for the Appellant, Christopher Aaron Hodges.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Barry P. Staubus, District Attorney General; and Emily Swecker, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

### I.  Factual Background

The Appellant was charged with sexual battery by an authority figure after an incident involving his fourteen-year-old stepdaughter, E.B. At trial, the victim testified that her birthday was May 23, 1999. In November 2013, she lived with her mother, E.R.; her mother's then-husband, the Appellant; her sixteen-year-old stepbrother, Z.H.; and her ten-year-old half-sister, A.H. The victim said that she had lived with the Appellant since she was three or four years old, that the Appellant acted like her father, and that in November 2013, she referred to the Appellant as "Dad."

The victim said that on November 6, 2013, she and her stepbrother returned home from school, and they talked with the Appellant in the kitchen. E.R. was still at work. The victim went into her bedroom, which was the "farthest room down the hall" of their one-story house. The victim lay down on her bed because she was suffering from menstrual cramps. The Appellant entered her bedroom and told her that he was angry and upset because he "found a – a condom wrapper from when [the victim] and her boyfriend had had sex." The Appellant did not say where he found the wrapper. The Appellant threatened to tell E.R. that the victim and her boyfriend had sex. The victim said that her "heart kind of dropped to [her] stomach" and that she felt "[i]t was probably one of the lowest points in [her] life."

The victim did not want to get into trouble and begged the Appellant not to tell E.R. The Appellant responded, "'What are you going to do for me if I don't?'" The victim said that she was upset and did not know what the Appellant meant. The Appellant told her that she "needed to take off [her] shirt and hug him for five minutes . . . so he wouldn't tell." The Appellant had closed and locked the victim's bedroom door. The victim lifted her shirt and bra, and the Appellant took off his shirt and hugged her. The victim said that she was "really uncomfortable" and that "it was unbearable." The victim ended the hug after less than a minute, but she felt like the hug lasted "forever."

The victim said that the Appellant told her she would have to do something else because the hug had not lasted five minutes. The victim's shirt and bra were still up, and the Appellant "massaged" her breasts "with his hands and his mouth." After two or three minutes, the Appellant removed his pants. The victim said that she was crying and that she said "no," but the Appellant did not listen to her pleas. The Appellant told the victim that she "would have to touch him or he would tell and [she] wouldn't want that."

The victim said that they moved to a "salon" chair the Appellant had given her because she wanted to be a hairstylist. The victim sat in the chair, and the Appellant stood in front of the chair. The Appellant made the victim touch his penis for ten or twenty minutes. The victim said that the Appellant "asked me to kiss him but I refused. And he tried to get me to give him a blow job, but I heavily refused." The Appellant told her to keep her shirt up and began to touch himself. The Appellant ejaculated on her stomach and put his pants back on.

The victim said that afterward, she went into her bathroom, which could be accessed only through her bedroom. The victim said that she kept a "Walmart bag on my door handle, kind of like a trash can." The victim got a "Wet Wipe," cleaned herself, and put the wipe in the Walmart bag. When she returned to her bedroom, the Appellant was gone. The Appellant later returned to the victim's bedroom and apologized. The victim responded that "it was okay, and I just wanted to be alone." The victim said that she stayed in her room, feeling sick and "in denial."

The victim said that she sent a message to her boyfriend telling him what the Appellant had done to her. Later that night, the Appellant told told the victim and Z.H. that the Appellant's father was dying and that the family needed to see him before he passed. The victim and Z.H. were upset by the news, and they went for a walk. During the walk, the victim told Z.H. what the Appellant had done to her. When they returned home, the victim went into her room, did not talk with anyone else, and listened to music on her cellular telephone.

The victim said that after being in her bedroom for "quite some time," she heard yelling and that the Appellant came into her bedroom asking if she had told Z.H. what had happened. The victim told the Appellant that she had not told Z.H. The Appellant asked how Z.H. knew, and the victim said that "'he must have overheard something.'" The Appellant rushed out of her bedroom.

The victim said that E.R. came home while the victim and Z.H. were out walking. About an hour or two after the walk, Z.H. told E.R. what the Appellant had done to the victim. E.R. was upset, crying, and screaming at the Appellant. E.R. made the victim, Z.H., and A.H. leave the house, get into the car with E.R., and lock the doors. The victim told E.R. that the victim and her boyfriend had sex. E.R. said she did not care and just wanted the victim to be safe. The Appellant claimed to be having a heart attack, so E.R. got out of the car and called 911. An ambulance came and took the Appellant to the hospital. After the ambulance left, E.R. called the police and reported the molestation.

The victim said that after the police arrived, she told the officer that she had used baby wipes to clean herself. The officer found and collected the baby wipes. The victim stated that she never consented to the acts with the Appellant and that she made it clear to him that she did not want to participate.

On cross-examination, the victim said that she remembered giving a statement to the police on the night of the offense at 10:44 p.m., approximately a couple of hours after the offense. The victim acknowledged that she failed to mention in her statement that the Appellant told her to take off her shirt and give him a five-minute hug or that the Appellant put his mouth on her breasts.

On redirect examination, the victim said that the Appellant was upset that she did not tell him that she had sex with her boyfriend. She explained, "He had told me once when we were driving somewhere in Kingsport—we were almost on Stone Drive—that if I had ever wanted to have sex, that I should tell him."

On further cross-examination, the victim said that E.R. was not upset that the victim and her boyfriend had sex but that E.R. "would have been a little upset if the incident hadn't occurred with [the Appellant]."

On further redirect-examination, the victim said that she did not tell E.R. that the Appellant molested her "so that she would be less mad at [the victim] about having sex."

E.R. testified that she and the Appellant were married for thirteen years. E.R. and the Appellant each had a child, the victim and Z.H., respectively, prior to the marriage. After the marriage, E.R. and the Appellant had one child together, A.H. While E.R. and the Appellant lived together, they "both act[ed] as parents over the children."

E.R. said that she spent the evening of November 5, 2013, with her father-in-law, who was hospitalized. She went straight to work the next morning, and left around 5:00 or 5:30 p.m. The drive home took approximately twenty minutes. When she arrived, the Appellant greeted her at the door, and they walked into the living room where Z.H. and the victim were sitting. Z.H. "was red-faced like he'd been crying," and E.R. thought he was upset because his grandfather was ill. The Appellant told the children that E.R. had a hard day at work and that they should go into another room. The Appellant made dinner, and he and E.R. ate in the living room.

E.R. said that she did not know where the children were, but A.H. walked into the living room and said that Z.H. was outside. E.R. thought Z.H. was still upset about his grandfather and said that she would go outside. The Appellant told E.R. not to get up, and he would "deal with" his son. A few minutes later, the Appellant and his son came inside the house. Z.H. stood beside E.R. and said, "'Mom needs to know. . . . Why don't you tell her what happened?'" E.R. said that Z.H. was not usually "stern" or "authoritative" with the Appellant. When neither the Appellant nor Z.H. would explain the situation further, E.R. told the Appellant to step into the hallway so she could talk with Z.H. alone.

E.R. said that after the Appellant left the room, Z.H. told her to speak with the victim. However, the victim refused to leave her room. E.R. said it was unusual for the victim to disobey. E.R. walked toward the victim's room, but the Appellant stopped her and said he wanted to talk with her. He explained that because of the victim's relationship with her boyfriend, the Appellant had showed the victim "'how to use a condom.'" The Appellant also told E.R. that he had found a condom wrapper in the victim's room.

- 4 -

E.R. said that she went into the victim's room and asked what had happened, but the victim refused to talk. E.R. told Z.H. and the victim to get into E.R.'s car so they could talk without the Appellant. While they were in the car, the Appellant tried to open the doors, but the doors were locked. The Appellant said that he was going to the hospital to stay with his father, and E.R. told him that was a good idea. E.R. then told the children it was "safe" to talk to her, but the victim would not talk. E.R. asked the victim if she and her boyfriend had sex, and the victim said yes. E.R. asked what else happened, and the victim started crying.

E.R. said that after the Appellant said he was leaving, he walked to the bottom of the hill, got into his white Ford Explorer, and parked it behind E.R.'s car. E.R.'s car was blocked, so she got out of the car and asked him to move his vehicle. The Appellant said that he would move his vehicle after he got a few more things from the house.

E.R. said that she called her mother because she "knew something was going on." During the call, the Appellant walked over and hugged Z.H. then hugged the victim and told the victim he was sorry. The victim said, "'That's okay.'" The Appellant went back inside the house. E.R. and the children got out of the car and went inside the house. She went into Z.H.'s bedroom with him, and he locked the door. Z.H. said, "'Dad's been messing with [the victim].'"

E.R. said that she heard A.H. screaming, and the victim told her that the Appellant was having a heart attack. E.R. found the Appellant on the floor of their bedroom and called 911 for an ambulance. The Appellant did not return to the house after he left the hospital that night.

E.R. said that after the ambulance left, she and the victim walked back inside the house and went into the victim's bedroom. E.R. asked if the Appellant had exposed himself to the victim. The victim said that he had but was reluctant to say anything else. E.R. testified, "I just remember getting the impression that all that happened was that he exposed himself." The victim asked E.R. not to say anything because the Appellant's father was in the hospital. Nevertheless, approximately twenty minutes later, E.R. called the police. Thirty minutes to an hour later, a female police officer came to the house, interviewed the victim, and told E.R. what the victim had reported. E.R. said that she "was in shock," explaining, "You know, it's – it's a lot different when you think that, 'Okay, you saw your dad's penis," over him – with a female officer telling me that he ejaculated on her.'"

E.R. said that the female officer went into the victim's bedroom and collected two baby wipes from the trash. E.R. said that the bathroom's only access was through the victim's bedroom and that the Appellant never used it.

E.R. said that after the offense, she moved to an apartment in the same school district and no longer lived with the Appellant. She eventually asked the Appellant about the incident, and he said that he "blacked out." The Appellant said that he had not been eating right and that his "diabetes was really out of control." E.R. acknowledged that they did not have medical insurance and that medicine did not help the Appellant. E.R. said that the Appellant never said anything else about the incident. E.R. said that she divorced the Appellant in April 2014, but she maintained that the divorce "had nothing to ever do with the children. . . . It was just based on his and my relationship."

E.R. said that on the night of the offense, the Appellant did not call while she was driving home to tell her about finding a condom wrapper in the victim's bedroom. E.R. thought the Appellant told her about the condom wrapper sometime after she got home.

On cross-examination, E.R. said that the officer found the baby wipes in the victim's bathroom in a plastic bag that was hanging on the door. E.R. said that the family referred to the plastic bag as the victim's "trash can."

E.R. clarified that "[t]his [incident] was the absolute reason why we got divorced" but that she and the Appellant had been separated previously because of marital problems. She explained that financial difficulties put a strain on their relationship.

E.R. said that Z.H. told her that the Appellant had been "messing with" the victim but that "to this day [the victim] has never told me the details."

E.R. said that at the time of the offense, she was working in a call center in Johnson City. She explained that she had been a "stay-at-home mom" but that she had to get a job when the Appellant, who was self-employed, became mentally incapable of working due to his blood sugar issues and his father's illness.

Officer Abby Rhymer Ford[1] testified that in November 2013, she was working for the Sullivan County Sheriff's Office. Officer Ford responded to E.R.'s report of a crime and arrived at the house at 10:22 p.m. Officer Ford spoke with E.R. and the victim in the living room. The victim told Officer Ford that she had cleaned herself with "baby wipes." Officer Ford collected the baby wipes from the victim's bathroom and put them in a plastic evidence bag. The wipes were later submitted to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing. Officer Ford said that the case was assigned to a detective and that she had no further involvement in the case.

---

[1] At the time of the offense, Officer Ford's surname was Rhymer.

On cross-examination, Officer Ford recalled that the baby wipes were in a bag the victim was using as a trash can in her bathroom. Officer Ford said that E.R. was not in the room when Officer Ford took the victim's statement.

Detective Tracy Haraz testified that she was a child abuse investigator with the Sullivan County Sheriff's Office. In November 2013, she was assigned to investigate the allegations against the Appellant. As part of the investigation, she collected DNA samples from the Appellant and the victim and submitted the samples to the TBI crime laboratory.

Detective Haraz said that she had never been inside the victim's residence and that she never obtained a search warrant for the house. Detective Haraz thought that Officer Thomas spoke with the Appellant at the hospital on the night of the offense.

Special Agent Terry Asbury with the TBI crime laboratory testified that she received DNA samples from the victim and the Appellant as well as the baby wipes from the victim's bathroom. Agent Asbury tested the first baby wipe but performed no tests on the second baby wipe. Agent Asbury found the Appellant's sperm on the wipe she tested. She also found a "partial DNA profile" on "the non-sperm fraction" which was "a mixture of genetic material from at least two individuals where at least one is male." The major contributor matched the Appellant; however, the profile on the minor contributor was inconclusive.

Agent Asbury said that her conclusions were consistent with the victim's wiping off the Appellant's ejaculate from her stomach. Agent Asbury said that whether the victim's DNA could be found on the wipe "depend[ed] on a variety of different factors," such as the rate at which the victim shed skin cells, how hard the victim wiped, and whether the major contributor left "such a high amount of DNA that it [would] override any of the DNA that's underneath."

Agent Asbury explained that she tested only one baby wipe

> [b]ecause both of the baby wipes were found together, [and] you would expect to see similar results on the baby wipes. I already established with the one baby wipe a forensic connection. In that respect, my policy asks me to stop examination with the one exhibit. And also, it serves as a way to preserve evidence in case it is needed for future testing.

The Appellant testified that he and E.R. were married for almost fourteen years and that the victim was almost three years old when he and E.R. got married. The Appellant said he treated the victim like a daughter.

- 7 -

The Appellant said that E.R. had spent the night of November 5, 2013, at home, not at the hospital with his father. He said that his sister spent that night with his father. The Appellant said that on the morning of November 6, 2013, he woke early to go to the hospital to relieve his sister. While E.R. was getting ready for work, she told the Appellant "the reason that she had just gotten this job was to be able to move out; that she was leaving me; that it wasn't working between us . . . ." E.R. said that she would stay with the Appellant until his father passed away.

The Appellant said that he went to the hospital, stayed until around 1:00 or 1:30 p.m., and planned to return to the hospital that evening. The Appellant went home, took a shower, and packed clothes for the night. The Appellant walked through the house looking for their two cats and found one of them on the victim's bed. He went into the victim's bedroom to get the cat and saw a condom and a condom wrapper on the nightstand beside the victim's bed. The Appellant said that he "had a chew of tobacco in" his mouth and that he went into the victim's bathroom to spit the tobacco into the toilet. In the corner of the bathroom, he saw a trash can "running over" with "paper towels, baby wipes." He saw a condom on top of the baby wipes in the trash can and became "furious[,] . . . extremely mad."

The Appellant said that shortly thereafter, the victim and his son came home from school. The victim was "complaining with cramps" and went into her bedroom. The Appellant took her water and pain medicine. Z.H. told the Appellant that he was going to a friend's house. After his son left, the Appellant returned to the victim's bedroom and "confronted her about the condoms and – and having sex with her boyfriend." The Appellant said that the conversation was "[v]ery heated," that he "was extremely upset," that he called the victim names, and that he told the victim he "didn't want a slut in [his] house." The Appellant asked the victim for the telephone number of her boyfriend's parents so that he could tell them about the victim's sexual relationship with their son. The victim refused to give the Appellant the information.

The Appellant said that while he was "confronting" the victim, a neighbor who knew the Appellant's father was ill brought the family a cooked roast. After the neighbor left the food, the Appellant resumed the conversation with the victim, again demanding contact information for her boyfriend's family, but the victim continued to refuse to provide it. Thereafter, a different neighbor came by to ask the Appellant to babysit his grandson for a little while. A.H. got off the bus while the Appellant was talking with the neighbor. Z.H., who had returned, stood outside while the Appellant and the neighbor were talking. The victim came outside, punched Z.H. on the shoulder, and asked him to go for a walk with her.

The Appellant said that when E.R. came home, he cut the roast for dinner and sent text messages to Z.H. and the victim telling them it was time to eat, but they did not return

home until later in the evening. The Appellant and E.R. sat in the living room and talked while they ate. Later, the Appellant was washing the dishes, and he asked Z.H. to take out the trash. Z.H. walked outside but did not take the trash. The Appellant followed Z.H. and asked what his problem was. Z.H. looked at the Appellant with "a very angry face" and threatened to "'tell.'" The Appellant thought Z.H. was referring to the victim and her boyfriend. Z.H. "storm[ed]" into the house and said something to E.R. The Appellant was not inside the house and did not hear what Z.H. had said. E.R. made all three children get into her car, and she locked the car doors.

The Appellant said that E.R. told him, "'I can't believe what you've done.'" The Appellant replied, "'What? . . . [The victim] had sex with an 18-year-old boy in our home.'" E.R. responded, "'She's – she's 13. She's going to have sex. I don't care.'" The Appellant told E.R. he was leaving to spend the night at the hospital with his father. He backed his car "up into the driveway," parked it behind E.R.'s car, and went into the house to get his duffel bag. E.R. "was screaming and going on." The Appellant said, "I lost it and I can't remember anything except for looking in the – out of the back of the ambulance and seeing her and [Z.H.] standing at the back."

The Appellant said at that time, he had "extreme diabetes," and they did not have medical insurance. He got Metformin from "Friends in Need," but the medication was not helping his diabetes. The Appellant said that his father had been in the hospital for a couple of months and that only he and his sister took care of his father. The Appellant's father passed away in December 2013.

On cross-examination, the Appellant acknowledged that he considered the victim his daughter and that finding the condom and condom wrapper in the victim's bedroom upset him so much he called the victim a "slut." He said that he did not confront the victim immediately after she got home because he did not want Z.H. to overhear the confrontation, and he thought that any discussion should be limited to himself, the victim, and E.R.

The Appellant said that he found the condom wrapper at 2:45 p.m., a few minutes before Z.H. and the victim got off the school bus. The Appellant did not call E.R. and discuss the matter with her. The Appellant thought the victim needed to tell E.R. because "that's a female thing. I think . . . that the female should take care of it."

The Appellant acknowledged that normally he would not use the victim's bathroom. The Appellant said that the victim's bedroom door was not locked and that he found the used condom on top of the trash can in the victim's bathroom. The Appellant put the condom into "a baggie" and intended to put it in his bedroom. He explained that he was going "[t]o keep it because this boy was 18 years old." The Appellant said that after he was taken to the hospital, he was not allowed to return to the house except to get a few belongings. He thought the condom must still be "in a baggie somewhere."

The Appellant said that the victim was "a very headstrong girl. I couldn't even get her to do dishes. [The victim] was very manipulative when it came to getting out of housework." Usually, E.R. handled the victim's discipline.

The Appellant said that he thought he had to be taken to the hospital on the night of the offense because of "stress and high blood sugar." The next morning, he had to take a "stress test," then he was released from the hospital.

The defense called the victim as a witness. The victim said that E.R. called an ambulance for the Appellant. The victim said that she was in her bedroom, not with Z.H., when Z.H. told E.R. that the Appellant had molested the victim. The victim said she was not sure if she "ever really told" her mother.

The victim said that she told Officer Ford that E.R. "asked about it and [the victim] just kind of went, 'Yeah.'" The victim said that she and E.R. were in the car and that they were both upset. The victim did not remember the specific questions her mother asked.

The State called the victim as a rebuttal witness. The victim said that the condom wrapper the Appellant found was on her dresser, which was in the left corner of her bedroom and near her bed. She said she and her boyfriend put a used condom inside the Walmart trash bag. The victim "guess[ed]" that after the Appellant found the condom wrapper, he went through her trash and found the used condom. The Appellant asked her about the condom and showed it to her. The victim said that she saw the Appellant flush the condom down the toilet after he touched her.

On cross-examination, the victim said that the condom was used approximately four days to one week prior to the offense. Regarding her statement to police that the condom was used approximately two weeks prior to the offense, the victim said that it was difficult to remember and agreed that "[a]t the time," she was "making it seem longer to try to protect [her] boyfriend."

A.H. testified that on November 6, 2013, the victim and her stepbrother got home from school before she did. When A.H. got home, the Appellant was in the victim's bedroom with the door closed, yelling at the victim. A.H. did not know what the yelling was about, and she went into the living room and did her homework. A.H. recalled that a neighbor knocked on the door and that she called for the Appellant to come to the door. When the Appellant came out of the victim's bedroom, he seemed upset.

At the conclusion of the trial, the jury found the Appellant guilty of sexual battery by an authority figure. The trial court imposed a sentence of five years. No motion for new trial or direct appeal was filed. Thereafter, the Appellant filed a petition for post-

conviction relief, and the trial court allowed the Appellant to file a motion for new trial and granted a delayed appeal. In this delayed appeal, the Appellant challenges the denial of his motion for a judgment of acquittal at the close of the State's proof pursuant to Tennessee Rule of Criminal Procedure 29, the trial court's ruling as a thirteenth juror pursuant to Tennessee Rule of Criminal Procedure 33(d), the trial court's refusal to grant a continuance, the trial court's failure to allow defense counsel to make a closing argument before instructing the jury, and the trial court's failure to grant a motion for new trial.

## II. Analysis

### A. Deficiencies in Brief

Initially, we note that the State contends that the Appellant has waived his claims because his brief fails to comply with Rule 27(a)(6), Tennessee Rules of Appellate Procedure, which requires that an appellant's brief contain "[a] statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record." The Appellant's brief contains no statement of facts. Additionally, for each of the issues presented, the Appellant failed to provide appropriate citations to the record. Despite deficiencies in the brief, we will consider the issues. "We caution . . . , however, that appellate review is frustrated by the failure to include facts relevant to the issues on appeal and the failure to identify the basis in the record for the argument presented and that compliance with the Rules of Appellate Procedure is expected." State v. Floyd Pete Lynch, No. E2019-00195-CCA-R3-CD, 2020 WL 1899611, at *3 (Tenn. Crim. App. at Knoxville, Apr. 17, 2020).

### B. Sufficiency of the Evidence

The Appellant maintains (1) that the trial court erred in not granting a judgment of acquittal at the close of the State's case and (2) that the trial court denied the Appellant's motion to set aside the jury's verdict as thirteenth juror. This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it has in this case, our appellate review is limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993); Tenn. R. Crim. P. 33(d). Moreover, a defendant generally waives his right to appeal a denial of a motion for a judgment of acquittal made at the conclusion of the State's proof when he chooses to put on proof and is left with a challenge to the sufficiency of the evidence. See State v. Collier, 411 S.W.3d 886, 893 (Tenn. 2013); Tenn. R. Crim. P. 29. Therefore, we will address the Appellant's complaints as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle,

639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Sexual battery by an authority figure as charged in this case is

> unlawful sexual contact with a victim by the defendant . . . [and] . . . [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less [than] eighteen (18) years of age . . . [and] . . . [t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the used the authority to accomplish the sexual contact.

Tenn. Code Ann. § 39-13-527(a)(1), (a)(3)(B). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). "'Intimate parts' includes semen, vaginal fluid, the primary genital area, groin, inner thigh, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2).

The proof at trial revealed that the Appellant and E.R. had been married for well over a decade, that the victim called the Appellant "Dad," and that the Appellant acted like the victim's father. On November 6, 2013, after the victim came home from school, the Appellant entered the victim's bedroom, confronted her with a condom wrapper he had found in her bathroom, and threatened to tell E.R. that the victim and her boyfriend had sex. The victim begged him not to tell, and the Appellant responded, "'What are you going

to do for me if I don't.'" The Appellant told her to take off her shirt and hug him for five minutes so he would not tell. The victim raised her shirt and bra, and the Appellant removed his shirt and hugged the victim. The victim said the hug seemed to last a long time but that it probably lasted less than a minute. The Appellant told the victim that she ended the hug early and that she had to let him "massage[]" her breasts with his mouth and hands. After approximately two or three minutes of touching her breasts, the Appellant removed his pants. Despite the victim's pleas to stop, the Appellant insisted that the victim touch him. The Appellant made the victim touch his penis with her hands for ten or twenty minutes. She refused his demand that she kiss him or give him a "blow job." The victim was crying, and the Appellant told her "he would be able to finish faster" if she stopped crying. Eventually, the Appellant ejaculated onto the victim's stomach then put his pants on. The victim went into her bathroom and cleaned her stomach with baby wipes. After the police were told about the offense, they collected the baby wipes. DNA testing on one of the baby wipes revealed the presence of the Appellant's semen. We conclude that the foregoing proof was more than sufficient to sustain the Appellant's conviction of sexual battery by an authority figure.

## C. Motion for New Trial

In his brief, the Appellant contends that he is entitled to a new trial because the following list of errors, either individually or cumulatively, deprived him of due process and a fair trial:

> a. The trial court erred by denying [d]efense counsel's oral pretrial motion on October 26, 2015 for a continuance to obtain various telephonic and text message communication relating to a possible motive regarding the incident in question.
>
> b. In accordance with Tennessee Rules of Criminal Procedure, Rules 12(b) and 16(a)(1)(b), and the Constitutions of the United States and State of Tennessee, respectively, a Defendant has the right to present a complete defense and has the right to a fair trial.
>
> c. Failure to grant the Defendant/Appellant a continuance to obtain said evidence was prejudicial and constituted reversible error.
>
> d. The trial court erred in denying the Defendant/Appellant's constitutional right to present a defense, as recognized in Holmes v. South Carolina, 547 U.S. 319 (2009), by denying his oral motion for a continuance on October 26, 2015.

e.  The Appellant should have been afforded a continuance to obtain potentially exculpatory proof.

f.  The proper remedy by the trial court should have been to grant Appellant's requested continuance, and the Court's failure to do so was prejudicial and reversible error.

g.  The trial court erred in denying, at the conclusion of the State's proof, the verbal Motion for Judgment of Acquittal made by the Appellant.

h.  The Appellant contends that, even viewing the evidence in the light most favorable to the State, the State of Tennessee had not proven beyond a reasonable doubt that the Defendant/Appellant was guilty of Sexual Battery by an Authority Figure.

i.  Throughout its case in chief, the State failed to show that the DNA lifted from the baby wipes matched that of the victim . . . .

j.  Moreover, the State's expert witness, Special Agent Terra Asbury with the Tennessee Bureau of Investigation, testified at trial that – while two DNA profiles were present on the baby wipes – the identity of the minor contributor was inconclusive and could not be tied to the victim.

k.  The trial court erred in not affording [d]efense counsel the opportunity to make a closing statement prior to jury instructions.

l.  Though not explicitly requested by [d]efense counsel, the timing of the closing statement would have afforded the Defendant/Appellant one final opportunity to address and illustrate the weaknesses in the State's case prior to instructing the jury.

Regarding the Appellant's contention that the trial court erred by denying his motion for a judgment of acquittal, we have addressed that contention *supra*. The Appellant also contends that the State failed to show the victim's DNA was on any of the baby wipes.

- 14 -

However, this argument goes to the sufficiency of the evidence, which we have already addressed.  The Appellant is not entitled to relief on this issue.

The Appellant further contends that the trial court erred by denying his oral pretrial motion for a continuance to obtain "telephonic and text message communication[s]" which may have been exculpatory and related "to a possible motive regarding the incident in question."  The Appellant maintains that the denial violated his constitutional right to present a defense.

Immediately prior to trial, defense counsel stated that he had requested the victim's telephone records for the day of the offense.  Defense counsel said that he and the State had concluded that the victim did not remember her cellular telephone number or provider at the time of the offense.  However, the Appellant had told defense counsel that the victim's telephone number would be on one of the Appellant's old cellular telephones which were in the State's possession.  Defense counsel requested a continuance to search the telephones to obtain the number and investigate the victim's telephone records.

The State opposed the motion, stating that at the time of the offense, the Appellant was the victim's stepfather and that he had the victim's cellular telephone number.  The State explained that it had some of the Appellant's older cellular telephones to search for evidence of other crimes, namely child pornography, but found no such evidence.  However, the State did not confiscate the cellular telephone the Appellant was using at the time of the offense.  The State said that it had been told by the victim that she had to change her telephone number because the Appellant called her continually and sent her text messages after the offense.  The State noted that a telephone number was on the victim's written statement, which the defense had received in discovery more than a year prior to trial, but the State did not know if it was the telephone number the defense needed.  The State asserted that even with the victim's number at the time of the offense, the Appellant could have obtained only "a call history that shows what numbers were called," which the State said was not material.

Defense counsel contended that if the State was going to allege at trial that the Appellant continued to call the victim after the offense, he also needed to obtain the Appellant's telephone records.  Defense counsel explained that he wanted the victim's telephone records to prove that the victim was sending text messages to her boyfriend at the time the Appellant was alleged to have been touching her.

The trial court noted that the Appellant had over a year to get the information and that the Appellant, who had been paying the bill, was the best person to have known where to obtain the information.  The trial court denied defense counsel's request.

It is well-established that the decision whether to grant a continuance rests within the sound discretion of the trial court. See State v. Mann, 959 S.W.2d 503, 524 (Tenn. 1997). The trial court's decision may only be reversed if the trial court abused its discretion and the appellant was improperly prejudiced. See State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). An appellant is improperly prejudiced by the denial of a motion for continuance when "a different result might reasonably have been reached if the continuance had been granted." Id.

The Appellant made no arguments in the lower court or in his brief to show that the decision not to grant a continuance prejudiced his defense. The Appellant's claim that the text messages existed was purely speculative. Moreover, as the State argued and the trial court found, the Appellant, as the victim's stepfather, would have known the victim's telephone number or of how to obtain the telephone number, and the Appellant failed to explain why he waited over a year before seeking the information. We conclude that the trial court did not abuse its discretion in denying the motion for a continuance.

Finally, the Appellant contends that the trial court erred in not allowing defense counsel to make a closing statement after the trial court instructed the jury. The appellate record does not reflect that the Appellant requested the trial court give the instructions prior to closing arguments. Moreover, the jury charge conference was not transcribed for our review. Tennessee Rule of Criminal Procedure 30(d)(2) explicitly provides, "The court may instruct the jury on the applicable law before or after closing argument. After closing argument the court may repeat all or part of the instructions that were given before closing argument. The court may also give additional instructions concerning organizational and related matters after closing argument." Prior to July 1, 2003, a trial court was required to "'instruct the jury after the arguments are completed.'" State v. Chett Allen Walker, No. E2002-03093-CCA-R3-CD, 2003 WL 22258181, at *10 (Tenn. Crim. App. at Knoxville, Oct. 2, 2003) (citing Tenn. R. Crim. P. 30(a)). However, "the current version [of Tennessee Rule of Criminal Procedure 30] provides the trial courts with greater discretion regarding the timing of jury instructions." State v. Ahmon Watkins, No. M2017-01600-CCA-R3-CD, 2019 WL 1370970, at *19 (Tenn. Crim. App. at Nashville, Mar. 26, 2019). The Appellant has not shown that he was prejudiced in any way by the timing of the closing arguments. The Appellant is not entitled to relief on this issue.

Regarding the Appellant's claim that he is entitled to relief due to cumulative errors, we note that "[t]o warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." State v. Hester, 324 S.W.3d 1, 77 (Tenn. 2010). Because the Appellant has not established any error, he is not entitled to relief pursuant to the cumulative error doctrine.

### III.  Conclusion

Finding no error, the judgment of the trial court is affirmed.


_____

NORMA MCGEE OGLE, JUDGE